UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

CHRISTA PAWLOWSKI,

**DECISION AND ORDER**

Plaintiff,

1:17-CV-00440(JJM)

v.

NANCY A. BERRYHILL,
ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION[1]

Defendant.

---

This is an action brought pursuant to 42 U.S.C. §§405(g) and 1383(c)(3) to review the final determination of defendant Nancy A. Berryhill, the Acting Commissioner of Social Security, that plaintiff was not entitled to Supplemental Security Income ("SSI") or Disability Insurance Benefits ("DIB"). Before the court are the parties' cross-motions for judgment on the pleadings [16, 19],[2] which the parties have consented to be addressed by me [13]. Having reviewed the parties' submissions [16, 19, 20], the action is remanded.

### BACKGROUND

The record reflects that in March 2013 plaintiff reported striking the back of her head on concrete during an assault, and was diagnosed with post-concussion syndrome. Administrative record [12], p. 223.[3] A CT scan of her brain taken at that time was normal. Id.,

---

[1] Since Nancy A. Berryhill is now the Acting Commissioner of Social Security, she is substituted for Commissioner of Social Security as the defendant in this action pursuant to Fed. R. Civ. P. 25(d).

[2] Bracketed references are to the CM/ECF docket entries. Unless otherwise indicated, page references are to numbers reflected on the documents themselves rather than to the CM/ECF pagination.

[3] Since plaintiff's motion centers on her post-concussion symptoms (headaches and dizziness), I have omitted plaintiff's psychological and cervical spine treatment from my summary.

p. 256. However, she reported persistent headaches consistent with migraines. Id., p. 272. On July 1, 2013, she was seen at the Dent Neurologic Institute ("Dent") by Minsoo Kang, M.D., who assessed her with a post-concussion syndrome, and noted that she was suffering from "posttraumatic headaches and cognitive dysfunction". Id., pp. 367-69. A July 21, 2013 MRI of plaintiff's brain was "[a]bnormal" due to a "[s]mall punctate T2/flair hyperintensity within the anterior frontal lobe on the right", which "may be seen in patients with migraines, micro-embolism, or hypo-profusion". Id., p. 278. Plaintiff returned to Dent on January 25, 2013 for a re-evaluation by physician assistant ("PA") Maria Rizzo for complaints of unsteadiness. PA Rizzo determined that plaintiff was "100% temporarily disabled", and should remain out of work until all testing was complete. Id., p. 274. Vestibular testing performed in August 13, 2013 was "suggestive of a physiologically uncompensated peripheral vestibular pathology", and PA Rizzo recommended vestibular therapy. Id., pp. 268, 270, 279.[4]

In November 2013, plaintiff reported to PA Rizzo that she was having migraine headaches once or twice a week, which came on when she exerted herself physically or mentally and could last all day long. Id., p. 265. At that time, she was prescribed Sumatriptan. Id., p. 267. In February 2014, PA Rizzo determined that plaintiff remained "temporarily 100% disabled", but believed "that her overall prognosis is quite good", and was "hopeful that she will return to full-time employment in the future". Id., p. 264. In March 2014, Dr. Kang similarly concluded that plaintiff was temporarily disabled since July 9, 2013. Id., p. 299.

In May 2014, plaintiff, who was 27 years old at that time, filed applications for DIB and SSI, alleging a disability onset date of July 9, 2013, due to post-concussion syndrome, depression and anxiety. Id., p. 177. In June 2014, physical therapist ("PT") Jacob McPherson,

---

[4] "Vestibular function refers to the sense of balance." Stern v. Colvin, 2017 WL 10085603, *3 (S.D.N.Y. 2017), adopted, 2018 WL 3863448 (S.D.N.Y. 2018).

who was a Vestibular Rehabilitation specialist, completed a Physical Residual Functional Capacity Questionnaire, which stated that he had treated plaintiff one to two times per week from September 11, 2013 through May 7, 2014. Plaintiff's symptoms included neck pain, dizziness, headaches, imbalance, and positional sensitivity. Id., p. 306. PT McPherson assessed plaintiff with a variety of physical restrictions, and concluded that these impairments would likely cause her to be absent from work about four days per month depending on the work environment, which he recommended be neither loud nor busy. Id., pp. 308-10.

At the July 14, 2014 consultative examination performed by Donna Miller, D.O., plaintiff complained of neck pain and of daily headaches. Id., p. 325. Plaintiff reported that "[s]he cooks twice a week, cleans three times a week, laundry once a week, and shops once a month". Id., p. 326. Plaintiff also reported to Dr. Miller that she believed that "an MRI and CT scan of her head . . . were normal". Id., p. 325. Although Dr. Miller ordered an x-ray of her cervical spine, it does not appear that she ordered or reviewed any diagnostic imaging of plaintiff's brain. Dr. Miller concluded that "[b]ased on today's physical findings [plaintiff] has mild limitation for heavy lifting, bending, pushing, and pulling". Id., p. 328.

Shortly after the consultative examination, the claims were initially denied. Id., pp. 91-94. On September 5, 2014, plaintiff reported to PA Rizzo that her headaches had not improved. Id., p. 420. It was noted that Amitriptyline "no longer seems to be providing . . . headache suppression. . . . Sumatriptan still works quite well when needed, but she is having 4-5 migraine days every week and at time she needs to simply observe her symptoms rather than treating in order to avoid over medication. . . . [Plaintiff] has agreed to treatment with botulinum toxin [("botox")] injections". Id. She was instructed to not to take more than two doses of Sumatriptan in a day and no more than three doses per week. Id., p. 422.

In September 2015, plaintiff reported to Dr. Kang that she was experiencing "constant daily headaches", and that the previously recommended botox injections were not approved by her insurer. Id., p. 410. At that time, plaintiff was starred on Topiramate for migraine prevention, Rizatriptan, a migraine abortive agent, and occipital nerve blocks. Id., pp. 411-12. At her subsequent occipital nerve block treatments, it was noted that she had a "positive tinel sign over the occipital nerves bilaterally", and that "[t]aping and palpation of these areas briefly reproduces the typical pattern of headache pain". Id., pp. 396, 398, 406, 458, 472.

On June 7, 2016 plaintiff reported to Nicolas Saikali, M.D. of Dent that she had migraine headaches between 15 to 20 days per month, that nerve blocks "cause her relief, but it wears off", and that Sumatriptan also worked well if she "catches it early enough". Id., p. 429. Dr. Saikali diagnosed plaintiff with "[c]hronic migraine without aura, intractable, with status migrainosus", and recommended botox therapy. Id., p. 431. On June 23, 2016, Dr. Saikali completed a Residual Functional Capacity Questionnaire in which he stated that plaintiff suffered from headaches between 15 to 20 days per month, each lasting at least four hours, and that this would cause her to miss more than four days of work per month. Id., p. 438.

An administrative hearing was held on July 7, 2016 before Administrative Law Judge ("ALJ") Lynette Gohr, at which plaintiff, who was represented by counsel, and a vocational expert testified. Id., pp. 33-66. Plaintiff testified that currently her dizziness prevented her from working, that the physical therapy "relieved all of [her] symptoms", but since physical therapy concluded in 2014, her symptoms "have slowly come back and gotten worse". Id., pp. 40-41. She also testified that she has migraines "[a]ll the time" that get worse with light and noise, but that she gets nerve block injections once a month that provide temporary relief for two weeks. Id., p. 43. When her headaches occur, she must sit in a dark room with no sound or

lights until it passes. Id., p.44. The vocational expert testified that an individual absent four or more days per month is not employable. Id., p. 64.

On July 12, 2016 Lixin Zhang, M.D. of Dent Neurologic Institute performed a neurologic consultation for plaintiff's complaints of dizziness. Id., p. 454. He found that the July 2013 MRI was "unremarkable". Id., p. 454. Dr. Zhang believed that plaintiff's "problems are brain neuronal hyperactivity, hypersensitivity related to dizziness and the headaches", and recommended that she be treated using antiseizure medication. Id.

On October 11, 2016 ALJ Gohr rendered a decision denying plaintiff's claim for benefits. She determined that plaintiff's severe impairments were "post-concussion syndrome; headaches; affective disorder; cervicalgia and myofascial pain syndrome". Id., p. 20. She assessed plaintiff with the residual functional capacity ("RFC") to perform light work, with the additional limitations of occasional stooping, kneeling, crouching and crawling, "can never climb ropes, ladders or scaffolds, can never work at unprotected heights or around moving mechanical parts, must avoid all work environments with loud noise, is limited to simple, work-related decisions, cannot tolerate strict production quotas, can tolerate minimal change in work routine and processes, is limited to simple, routine and repetitive tasks, can tolerate occasional interaction with supervisors, coworkers and the public and cannot tolerate work in teams or tandem". Id., p. 22. In reaching that RFC, ALJ Gohr gave "significant weight" to Dr. Miller's opinion, but gave "little weight" to the opinions of PA Rizzo, PT McPherson, and Dr. Saikali. Id., pp. 24-25.

Based on the RFC and other factors, ALJ Gohr determined that although plaintiff was unable to perform her past relevant work, there were sufficient jobs in the national economy that she could perform, and therefore was not disabled from July 9, 2013, her alleged onset date,

-5-

through the date of the decision. Id., pp. 25-27. The Appeals Council denied plaintiff's request for review (id., pp. 1-3), and thereafter she commenced this action.

## ANALYSIS

### A. Standard of Review

"A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (*quoting* 42 U.S.C. §405(g)). Substantial evidence is that which a "reasonable mind might accept as adequate to support a conclusion". Consolidated Edison Co. of New York. Inc. v. NLRB, 305 U.S. 197, 229 (1938).

It is well settled that an adjudicator determining a claim for Social Security benefits employs a five-step sequential process. Shaw, 221 F.3d at 132; 20 C.F.R. §§404.1520, 416.920. The plaintiff bears the burden with respect to steps one through four, while the Acting Commissioner has the burden at step five. Talavera v. Astrue, 697 F.3d 145, 151 (2d. Cir. 2012).

Plaintiff argues that remand is required since ALJ Gohr failed to offer any legitimate reason for her credibility determination (plaintiff's Memorandum of Law [16-1], pp. 14-18), failed to make any specific findings regarding the frequency and duration of her headaches (id., pp. 18-19), and the RFC assessment was only supported by ALJ Gohr's lay judgments. Id., pp. 19-22.

### B. Did ALJ Gohr Properly Assess Plaintiff's Credibility?

Plaintiff argues that "remand is required because it is not clear what the ALJ's legitimate reasons for [the credibility] finding were". Plaintiff's Memorandum of Law [16-1], p.

15. In assessing the credibility of a claimant's subjective complaints, the regulations require the ALJ to employ a two-step inquiry. *See* Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (Summary Order). "First, the ALJ must determine whether the claimant suffers from a 'medically determinable impairment[ ] that could reasonably be expected to produce'" the alleged symptoms. Id. (*quoting* 20 C.F.R. §404.1529(c)(1)). "Second, the ALJ must evaluate the intensity and persistence of those symptoms considering all of the available evidence; and, to the extent that the claimant's [subjective] contentions are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." Id. The ALJ must assess the credibility of the claimant's subjective complaints by considering the entire record in light of the following symptom-related factors: (1) claimant's daily activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§404.1529(c)(3)(i)-(vii); 416.929(c)(3)(i)-(vii).

"[T]he court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain" if supported by substantial evidence. Aponte v. Secretary, Department of Health & Human Services of the United States, 728 F.2d 588, 591 (2d Cir. 1984). While "[i]t is the function of the [ALJ], not [the Court] . . . to appraise the credibility of . . . the claimant", Carroll v. Secretary of Health & Human Services, 705 F.2d 638, 642 (2d Cir. 1983), "[t]he ALJ must explain a decision to reject a claimant's testimony with sufficient specificity to enable the reviewing Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether the ALJ's decision is supported by substantial evidence." Quintana v. Colvin, 2017 WL

752187, *13 (S.D.N.Y. 2017). *See also* Judelsohn v. Astrue, 2012 WL 2401587, *6 (W.D.N.Y. 2012) ("[f]ailure to expressly consider every factor set forth in the regulations is not grounds for remand [so long as] the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination"). Thus, credibility "findings 'should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.'" Nix v. Astrue, 2009 WL 3429616, *5 (W.D.N.Y. 2009) (*quoting* Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995)); Konidis v. Colvin, 2015 WL 2454004, *7 (W.D.N.Y.), adopted, 2015 WL 2454038 (W.D.N.Y. 2015) ("credibility determinations must contain specific findings based on substantial evidence in order to allow for review"); Gumaer v. Colvin, 2014 WL 701770, *5 (N.D.N.Y. 2014). "A recitation of the evidence, without more, is insufficient to permit th[e] Court to review the ALJ's credibility determination." Spear v. Astrue, 2014 WL 4924015, *20 (W.D.N.Y. 2014).

Here, after reciting the two-step process for determining credibility, ALJ Gohr found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record". [12], pp. 22-23. She then recited some of plaintiff's medical history and weighed the various medical opinions of Drs. Miller, Kang, and Saikali before summarily concluding that the RFC "is supported by the objective medical evidence, the nature and extent of the claimant's treatment, the claimant's admitted activities and the credible opinion evidence". Id., pp. 23-25.

ALJ Gohr's conclusory credibility determination lacks any specific explanation as to why plaintiff's subjective complaints concerning the intensity and persistence of her

-8-

headaches are not supported by the record. See Konidis, 2015 WL 2454004, *7 ("the ALJ merely presented the recitation of the medical record without stating the specific inconsistency of that record to plaintiff's stated complaints to justify questioning her credibility"); Spear, 2014 WL 4924015, *20.

Although plaintiff argues that the perceived lack of objective findings would not be an appropriate reason to diminish [her] credibility" (plaintiff's Memorandum of Law [16-1], p. 17), "[o]bjective medical evidence . . . is a useful indicator to assist [the Commissioner] in making reasonable conclusions about the intensity and persistence of [a claimant's] symptoms and the effect those symptoms . . . may have on [his] ability to work." 20 C.F.R. § 404.1529(c)(2). Nevertheless, it is difficult to glean from ALJ Gohr's credibility determination specifically how the objective medical evidence was considered in making the credibility determination concerning her headache related complaints,[5] especially given plaintiff's treatment history and the presence of at least some corroborating objective tests (*e.g.*, the July 2013 MRI showing an abnormality which "could correlate with migraines" [12], p. 23).[6]

Nevertheless, even if the objective medical evidence did not corroborate plaintiff's symptoms, the Acting Commissioner acknowledges that ALJ Gohr was required to

---

[5] Although ALJ Gohr noted that plaintiff's July 2016 examination by Dr. Zhang was "essentially normal", that examination was for her complaints of dizziness, as opposed to headaches. [12], pp. 23, 454.

[6] Although not specifically argued by plaintiff, some courts have noted that because there is not an objective clinical test to corroborate the existence of migraines, "the lack of objective evidence of a migraine is not a legitimate basis to discount a claimant's testimony". Barrus v. Berryhill, 2017 WL 4772580, *9 (D. Utah), adopted, 2017 WL 4736728 (D. Utah 2017). *But see* Donerson v. Commissioner of Social Security, 2017 WL 6987958, *7 (N.D. Ohio 2017), adopted, 2018 WL 454392 (N.D. Ohio 2018) ("the ALJ did not err in relying on the lack of objective evidence as one factor in discounting Plaintiff's credibility regarding the limiting effects of her migraines").

consider the factors set forth in 20 C.F.R. §§404.1529(c)(3)(i)-(vii) and 416.929(c)(3)(i)-(vii). Acting Commissioner's Brief [19-1], p. 7. While ALJ Gohr pointed to "the nature and extent of the claimant's treatment" and "the claimant's admitted activities" as the factors she considered in resolving plaintiff's credibility ([12], p. 25), neither of these factors were sufficiently addressed.

ALJ Gohr's conclusory reference to "the nature and extent of the claimant's treatment" ([12], p. 25) fails to explain how that factor was considered in assessing plaintiff's credibility. Plaintiff's Memorandum of Law [16-1], p. 18. The Acting Commissioner responds that ALJ Gohr "regularly noted the efficacy of the treatment Plaintiff had received, indicating that [her] symptoms were responsive to treatment and, therefore, not disabling to the extent alleged". Acting Commissioner's Response [19-1], p. 8. However, absent some explanation from ALJ Gohr, it is not evident from her recitation of the medical records how the various treatments which plaintiff received for her headaches and dizziness sufficiently controlled her symptoms. Plaintiff's Reply [20], p. 2.

ALJ Gohr's summary of the medical evidence ([12], p. 23) demonstrated that in 2014 plaintiff was seeing benefits from her treatments. As noted by ALJ Gohr, plaintiff reported in February 2014 having migraine "headaches . . . once per week that respond to Sumatriptan" Id., pp. 23, 262 ("posttraumatic migraine is occurring on average about once per week now, and she is responding to sumatriptan 100 mg for the most part. She admits that she sometimes delays treatment, and at those time she will feel ill for a few hours before sumatriptan has effect"). Plaintiff also testified that her dizziness was under control in 2014 when she was attending therapy. Id., pp. 40-41. Yet, plaintiff's condition deteriorated by June 2016 – approximately two years after Dr. Miller's 2014 consultative examination. Notwithstanding the efficacy of her treatments at that time, plaintiff was still experiencing headaches 15 to 20 days per month, which

she reported lasted four hours each. Id., pp 23, 462. She also was experiencing worsening dizziness, which Dr. Zang attributed to neuronal hyperactivity and recommended treating with antiseizure medication, but there appears to be nothing in the record as to whether that treatment was ultimately effective in controlling her symptoms. Id., p. 454. Thus, without further explanation, it does not appear from the record that plaintiff's treatments were effective in managing her symptoms. *See* Coulter v. Berryhill, 2017 WL 4570390, *7 (W.D.N.Y. 2017), adopted, 2017 WL 4541010 (W.D.N.Y. 2017) ("[t]he record also does not reflect whether the occipital nerve blocks were a long-term solution to plaintiff's headaches or that the treatment controlled them such that they had less than a minimal effect on her ability to perform work activities on a daily basis").

With respect to her daily activities, plaintiff argues that "[t]he fact that [she] does not shudder [*sic*] herself in her room is no basis to deny her claim for disability". Plaintiff's Memorandum of Law [16-1], p. 18. From ALJ Gohr's conclusory credibility determination, it is not evident how plaintiff's ability to cook, clean, shop and do laundry "as necessary" - *i.e,* cooking twice a week, cleaning three times a week, doing laundry once a week, and shopping once a month ([12], pp. 23, 326) - is consistent with her ability to perform light work on a sustained basis. "Courts in this Circuit consistently have observed that a claimant's participation in the activities of daily living will not rebut his or her subjective statements of pain or impairment unless there is proof that the claimant engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job." Starzynski v. Colvin, 2016 WL 6956404, *4 (W.D.N.Y. 2016); Vasquez v. Barnhart, 2004 WL 725322, *11 (E.D.N.Y. 2004) ("[u]nder the law of the Second Circuit a finding that a claimant is capable of undertaking basic activities of daily life cannot stand in for a determination of whether that person is capable

of maintaining employment, at least where there is no evidence that the claimant 'engaged in any of these activities for sustained periods comparable to those required to hold a sedentary job'").

Based on her conclusory assessment of plaintiff's credibility, I am unable to determine whether ALJ Gohr's credibility determination is supported by substantial evidence. *See* Gorman v. Colvin, 2014 WL 537568, *9 (E.D.N.Y. 2014); Jaeckel v. Colvin, 2015 WL 5316335, *11 (E.D.N.Y. 2015) (remanding where the ALJ "failed to properly consider the factors in 20 C.F.R. § 404.1529(c)(3) other than activities of daily living with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence"). Therefore, remand is necessary on this basis.

In connection with plaintiff's remaining arguments, on remand the ALJ should also revisit the analysis of the record evidence, including the weight assigned to the opinion of consultative examiner, Dr. Miller, whose opinion was rendered in 2014, approximately two years before plaintiff began experiencing worsening headache and dizziness symptoms, and appears to be based, in part, upon a disbelief that the MRI of plaintiff's brain was normal. *See* Frawley v. Colvin, 2014 WL 6810661, *9 (N.D.N.Y. 2014) ("[t]he opinions of consultative examiners . . . may constitute substantial evidence where . . . it is supported by the medical evidence in the record").

## CONCLUSION

For these reasons, plaintiff's motion for judgment on the pleadings [16] is granted to the extent that this case is remanded to the Acting Commissioner for further proceedings consistent with this Decision and Order, and the Acting Commissioner's motion [19] is denied.

**SO ORDERED**.

Dated: March 19, 2019

/s/ Jeremiah J. McCarthy  
JEREMIAH J. MCCARTHY  
United States Magistrate Judge